IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

RACHEL A. ZIMMERMAN,

                        Plaintiff,                  OPINION AND ORDER

    v.

                                            09-cv-089-bbc

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This is an action for judicial review of an adverse decision of the Commissioner of Social Security brought pursuant to 42 U.S.C. § 405(g).  Plaintiff Rachel A. Zimmerman seeks reversal of the commissioner's decision that she is not eligible for child's insurance benefits under 42 U.S.C. § 402(d) because she was not disabled before the age of 22.  She argues that the administrative law judge erred in evaluating the medical opinions of record. and that he should have adopted her treating physician's opinion that her mental impairment met a listed impairment and that she would miss three days of work a month because of her impairment.  Plaintiff also contends that the administrative law judge should have accounted in his residual functional capacity assessment  for the additional limitations found by the state agency physicians, Dr. Radisewitz-Rommes and Dr. Rattan,

1

I conclude that the administrative law judge properly evaluated the medical opinions and that his conclusion is supported by substantial evidence in the record.  Therefore, I am denying plaintiff's motion for summary judgment and affirming the administrative law judge's decision.

As a preliminary matter, I note that plaintiff's brief in support of her motion for summary judgment is 61 pages in length.  I previously told plaintiff's lawyer, Dana Duncan, that I would not read any brief of his that exceeded 40 pages in length unless he asked for and was granted an exemption.  He never asked for such an exemption in this case.  On October 19, 2009, I issued a decision in Larson v. Astrue, case no. 09-cv-067-bbc (W.D. Wis. Oct. 19, 2009), in which I noted that Attorney Duncan had filed a 66-page brief and that was the last time I would make an exception for a brief longer than 40 pages.  However, because this case was fully briefed before I entered that order, I will consider plaintiff's brief in this case.  In the future, I will consider only the first 40 pages of any brief he files.

The following facts are drawn from the administrative record (AR):

FACTS

A. Background and Procedural History

Plaintiff was born on November 27, 1984 and was 22 years old at the time of the hearing.  AR 348.  She graduated from high school and attends college.  AR 348-49.  In the past, plaintiff has worked as a cashier and done some landscaping work.  AR 23.

Plaintiff filed an application for child's insurance benefits on November 27, 2002, alleging that she had been unable to work since November 1, 2000 because of a bi-polar disorder.  AR 21.  After the local disability agency denied plaintiff's application initially and upon reconsideration, plaintiff requested a hearing, which was held on April 9, 2007 before Administrative Law Judge John Pleuss.  The administrative law judge heard testimony from plaintiff, AR 348-62, plaintiff's witness, AR 362-70, and a neutral vocational expert, AR 370-73.  On April 26, 2007, the administrative law judge issued his decision, finding plaintiff not disabled.  AR 21-29.  This decision became the final decision of the commissioner on January 5, 2009, when the Appeals Council denied plaintiff's request for review.  AR 5-6A.

In October 2004, the Department of Veterans Affairs found that plaintiff was entitled to "helpless child benefits" as of September 2004 because of her bipolar disorder.  AR 342-43.

3

B.  <u>Medical Evidence</u>

1.  <u>Initial diagnosis and civil commitment</u>

In June 2001, when plaintiff was 17, she was admitted to Mendota Mental Health Institute.  Psychiatrist Dr. Tea Gil Kwon diagnosed alcohol intoxication, bipolar disorder, oppositional-defiant disorder and a current Global Assessment Functioning Score of 40.  AR 153.  On June  26, 2001, plaintiff was discharged and admitted to Gunderson Lutheran Hospital for her fourth admission to that hospital in one month.  AR 221.  She was treated by psychiatrist Dr. Larry S. Goodlund.  AR 221.  Goodlund diagnosed bipolar disorder, rapid cycling and assigned her a Global Assessment Functioning score of 50.  At the time, plaintiff was taking Seroquel, Depakote and Zoloft.  AR 222-23.

On June 28, 2001, psychiatrist Thomas J. Trannel performed a court-ordered evaluation of plaintiff for a potential Chapter 51 commitment.  AR 121.  He diagnosed bipolar disorder with significant contribution from disruptive behavior disorder, with an oppositional and defiant flare to her presentation.  He rated her Global Assessment Functioning Score between 50 and 55.  He recommended following through with plaintiff's commitment but moving her to less restrictive level of care than psychiatric hospitalization. AR 124.

On July 2, 2001, psychologist Richard Listiak performed a court-ordered evaluation of plaintiff and concluded that

4

> At this point, given Rachel's history of not cooperating and her presentation of being a rather stubborn and controlling young lady, it would seem that the least restrictive alternatives at this point for her treatment would be that of a court ordered structured outpatient day treatment program. In addition, given Rachel's unpredictability, it is likely that a court order for medication would be necessary.

AR 127.

From July 5, 2001 to January 5, 2002, plaintiff was subject to a Chapter 51 commitment. AR 241. She was discharged from Gunderson to her parents' home on July 5, 2001, AR 242, and required to attend day treatment, take all prescribed medication, refrain from self harm activities or threats or harm to others and avoid consumption of illegal drugs and alcohol. AR 243.

2.  Treatment by Dr. Goodlund

On April 9, 2002, Dr. Goodlund prescribed Tegretol and Celexa for plaintiff's bipolar disorder. AR 206. He increased her Tegretol dosage on May 8, 2002. AR 204.

In June 2002, plaintiff was arrested for disorderly conduct, bailed out by a friend and subsequently rearrested for violating the terms of her bond. AR 203. On June 5, 2002, she was admitted to Gunderson Lutheran Hospital and seen by Goodlund, who reported that it was difficult to sort out whether plaintiff's condition was primarily bipolar rapid cycling or affective disorder with a rather large oppositional defiant component. He planned to get her back on the appropriate dose of Tegretol and discharge her into the community. AR

217.  Plaintiff was discharged on June 11, 2002.  AR 213.  On July 3, 2002, Goodlund prescribed Tegretol and Celexa.  AR 199.

On July 9, 2002, plaintiff again was evaluated by Dr. Trannel at the request of La Crosse County Human Services.  AR 233.  Trannel questioned whether plaintiff's behavioral problems and substance abuse were related directly to her bipolar disorder diagnosis or a component of a behavioral disorder and adolescent development.  He wrote that "[b]ehavioral issues between Rachel and her family, as well as Rachel and care providers, have contributed to ongoing difficulties in multiple areas."  AR 238.  Dr. Trannel concluded that the "diagnosis of Bipolar Disorder continues to be accurate, but there is also a strong component of behavioral disorder (with parent/child relational problems) and possible underlying anxiety disorder that Rachel has not yet been able to discuss."  Id.  He found that plaintiff had a severe disabling mental illness that was most likely chronic in nature, assigned her a Global Assessment Functioning Score of 50 to 55, recommended further treatment and expressed the opinion that allowing plaintiff more independence and control over her life might drive her to seek treatment for herself.  AR 238-40.

In January 2003, Michael Dux, a social worker, completed a questionnaire concerning plaintiff.  He wrote that between July 2001 and October 2002, plaintiff lacked motivation and had poor judgment, insight and attention span.  Dux noted that plaintiff believed that her behavioral problems were her choice and not related to her bipolar disorder.  He noted

6

that she sometimes appeared fatigued and was isolated but was usually very cooperative and "incredibly intelligent." AR 165-66. Dux recommended therapy but added that plaintiff would have a lot to offer if her disorder was better managed with medication and she was "in a situation that forced her to be more responsible for herself." AR 166.

In January 2003, Dr. Goodlund wrote that plaintiff had rapid and fairly significant mood changes. AR 177. In February, he noted that plaintiff entered a manic phase in which her judgment became diminished, she engaged in reckless behavior and she became defiant of authority. In March, Goodlund continued her medication. AR 175. He did not see her again until December, when he assigned her a Global Assessment Functioning Score of 50. AR 334.

In 2004, Goodlund saw plaintiff several times between March and September. AR 311-23. He referred plaintiff to Dr. Kelly T. Clouse because she had requested shock therapy. AR 314. Clouse examined plaintiff on August 25, 2004 and diagnosed mood disorder but noted that "it is not entirely clear to me what the most appropriate diagnosis would be." AR 316. He wrote that prior medical notes were unclear and her history was not "completely convincing" because of several complicating factors, including her past oppositional behavior, alcohol and marijuana use, emotional immaturity and lack of independence from her parents. Id. Clouse assigned her a Global Assessment Functioning Score of 55. He indicated that given the uncertainty of plaintiff's diagnosis and current

mood state (not significantly depressed), he would not recommend shock therapy.   He recommended psychotherapy and consideration of other medications, including Lithium and Lamotrigine.  Id.

On August 26, 2004, Goodlund wrote to the Department of Veteran's Affairs, summarizing plaintiff's treatment.  He described plaintiff as mentally disabled with a rather guarded prognosis.  AR 116D.  On November 27, 2004, Goodlund informed the state disability agency that plaintiff would be unable to mange her own funds.  AR 263-64.

Plaintiff saw Dr. Goodlund several times in 2005.  He continued to prescribe medications for her bipolar disorder.  AR 299A-303.  He wrote, "I suspect the real truth is that she is just actually quite bright." AR 302.  On August 3, 2005, Goodlund wrote a letter to plaintiff's father concerning her Veterans Administration disability claim.  He wrote that plaintiff's condition had been quite disabling, but that her prognosis had been upgraded from guarded to fair.  AR 116B.

Plaintiff began attending college in the fall of 2005.  In December 2005, Goodlund saw plaintiff and reported that she had completed her first year of college and had a 3.2 grade point average.  He wrote that she had some insight and fair judgment.  AR 299A. Plaintiff saw Goodlund several times in 2006.  AR 290-91, 296-99.

In January 2007, Goodlund saw plaintiff and noted that she was doing well with medication and therapy.  AR 340.  He indicated she had a 3.8 grade point average in college. He assigned her a Global Assessment Functioning Score of 50.  AR 288-89.

On March 23, 2007, Goodlund completed a questionnaire concerning plaintiff's impairments.  He diagnosed bipolar disorder and a current Global Assessment Functioning Score of 60, with a high score of 70 in the past year.  He noted that plaintiff was taking Lamectal and Zoloft and had mild fatigue as a side effect of the medication.  Goodlund wrote that plaintiff was doing well but became irritated easily and had major difficulty sustaining long term attention.  AR 283.

Dr. Goodlund indicated that plaintiff had moderate restrictions of activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and that she had one or two episodes of decompensation. AR 285.  In evaluating the "C" criteria, he found that she had a medically documented history of affective disorder of at least two years in duration that caused more than a minimal limitation of ability to any basic work activity with symptoms or signs currently attenuated by medication of pyschosocial support and three or more episodes of decompensation within 12 months, each lasting at least two weeks.  He concluded that plaintiff's impairment met the listed impairment of Affective Disorder, 12.04.  Also,

9

Goodlund indicated plaintiff would be absent from work about there days a month because of her impairments or treatment.  AR 285-86.

### C.  Consulting Psychologists

#### 1.  Dr. Radisewitz-Rommes

On March 6, 2003, psychologist Diane Radisewitz-Rommes performed a consultative examination of plaintiff for the state disability agency.  Plaintiff reported that the medications she took for her bipolar disorder made her tired and that she had difficulty waking up in the morning.  She stated that she goes out with her boyfriend, goes to bed at 2:00 to 3:00 a.m. and sleeps until 1:00 p.m.  Plaintiff reported feeling depressed for a week at a time about three times a year.  Her parents indicated that she had monthly depressive episodes.  AR 167.

Dr. Radisewitz-Rommes diagnosed bipolar disorder with rapid cycling.  She wrote as follows:

> However, she does see herself as being capable of working as long as she does not have to get up in the morning to do so. Nevertheless, it would appear that she might be somewhat unaware of some of her limitations overall.

AR 171.  She concluded that plaintiff has the ability to understand, remember and carry out simple instructions and to respond appropriately to supervisors and coworkers.  Radisewitz-Rommes cautioned that it was possible that given the presence of an emerging manic episode

10

there could be significant conflict.  She also stated that although plaintiff was able to maintain concentration attention and pace, a manic episode and lack of motivation could affect this ability.  Radisewitz-Rommes concluded that plaintiff was doing quite well on her current medications.  AR 171-72.

2. Dr. Rattan

On March 13, 2003, state agency consulting psychologist Roger Rattan completed a Psychiatric Review Technique Form for plaintiff after reviewing the evidence of record.  He evaluated the evidence under the listing categories for affective and personality disorders.  In addressing the "B" criteria for these listings, he found that plaintiff had moderate restrictions of activities of daily living, moderate limitations in maintaining social functioning, moderate limitations in maintaining concentration, persistence or pace and two episodes of decompensation.  Dr. Rattan concluded that the evidence did not establish the presence of the "C" criteria.  AR 244-58.

Dr. Rattan completed a mental residual functional capacity assessment for plaintiff.  He found that she was moderately limited in the following areas:  remembering locations and work-like procedures; understanding, remembering and carrying out very short and simple instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance and being punctual within

11

customary tolerances; sustaining an ordinary routine without special supervision; working in coordination or proximity to others without being distracted by them; making simple work-related decisions; completing a normal work day and work week without interruptions from psychologically based symptoms; and performing at a consistent pace without an unreasonable number and length of rest periods. He indicated she was markedly limited in her ability to understand, remember and carry out detailed instructions. AR 259-60.

Dr. Rattan indicated that plaintiff was moderately limited in interacting appropriately with the general public; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without distracting them or exhibiting behavioral extremes; and maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness. Finally, Rattan found plaintiff was moderately limited in the ability to respond appropriately to changes in the work setting; the ability to be aware of normal hazards and take appropriate precautions; the ability to travel in unfamiliar places or use public transportation; and the ability to set realistic goals or make plans independently of others.

In a narrative summary, Dr. Rattan wrote that plaintiff was capable of routine and unskilled work with normal supervision but should not seek jobs requiring frequent close personal or public interaction. He noted that plaintiff did not have significant cognitive

12

dysfunction.  AR 259-61.  On June 26, 2003, state agency psychologist Keith E. Bauer affirmed Rattan's assessment.  AR 244, 261.

### D. <u>Hearing Testimony</u>

1. <u>Plaintiff's testimony</u>

Plaintiff testified that during the spring semester of 2007, she took two courses at the University of Wisconsin, LaCrosse, Wisconsin.  AR 349.  She testified that she had to drop a third class because she was getting behind.  AR 350.  Plaintiff testified that she had worked as a cashier one summer and had done some landscaping for her aunt.  AR 357-58.

Plaintiff testified that she has bipolar disorder and took Zoloft and Lamictal, which made her drowsy.  AR 355.  She testified that during the day, she slept after her classes.  AR 353.  On the weekends, she went out to the bars with her friends.  AR 355.  Plaintiff testified that she was treated by Dr. Goodlund but did not always tell him everything.  She testified that in November 2006, she had been depressed and had cut herself with a razor blade.  AR 356.  Plaintiff testified that she had recently missed a couple of days of school because of depression.  AR 361.

2.  Plaintiff's father's testimony

Plaintiff's father testified that plaintiff lived with him.  AR 362.  He testified that he woke plaintiff for school and encouraged her to take her medication.  AR 363-64.  He said that plaintiff she had an episode of depression every month and slept 12 hours a day.  AR 366-67.


3.  Vocational expert

The administrative law judge called Karl Botterbusch as a neutral vocational expert. He asked the expert to assume an individual of plaintiff's age, education and work experience with no exertional, postural or environmental limitations who had limited but satisfactory ability relating to co-workers, dealing with the public, interacting with supervisors, maintaining attention and concentration and demonstrating reliability and was seriously limited but not precluded from dealing with work stresses and understanding, remembering and carrying out detailed job instructions.  AR 372.  Botterbusch testified that the individual could work as a cleaner or housekeeper (10,800 jobs in Wisconsin), photocopying machine operator (800 jobs in Wisconsin), office helper (1,800 jobs in Wisconsin) and parking lot attendant (860 jobs in Wisconsin).  He testified that his testimony was consistent with The Dictionary of Occupational Titles.  AR 372-73.

14

Plaintiff's lawyer asked Botterbusch whether the same individual would be able to perform these jobs if she missed three days of work a month.  The expert's answer was not responsive to the question and was stricken.  AR 373.

## E.  The Administrative Law Judge's Decision

Under the Social Security Act, a child of an insured person is entitled to benefits if, among other things, she is more than 18 years old and has a disability that began before the age of 22 years.  42 U.S.C. § 404(d); 20 C.F.R. § 404.350(a).  In reaching his conclusion that plaintiff was not disabled before she turned 22 years old, the administrative law judge performed the familiar five-step sequential analysis required under 20 C.F.R. § 404.1520.  At step one, the administrative law judge found that plaintiff had not engaged in substantial gainful activity since November 1, 2000.  At step two, he found that plaintiff had the severe impairment of rapidly cycling bipolar disorder.  AR 23.

The administrative law judge found at step three that plaintiff did not have an impairment or combination of impairments that met or medically equaled any impairment listed in 20 C.F.R. 404, Subpart P, Appendix 1.  He found that plaintiff had moderate limitations in daily living, social functioning and concentration, with a history of no more than one to two extended episodes of decompensation and no evidence of "C" criteria.  AR 25.

Next, the administrative law judge determined that plaintiff had the residual functional capacity to perform work at any exertional level and that she had a limited but satisfactory ability to relate to co-workers, deal with the public, interact with supervisors, maintain attention and concentration and demonstrate reliability.  Also he found that she was seriously limited but not precluded from work requiring her to deal with work stresses and understand, remember and carry out detailed instructions.  AR 25.

At step four, the administrative law judge found that plaintiff did not have any past relevant work.  AR 27.  He found at step five that an individual of plaintiff's age, education, work experience and residual functional capacity could perform 10,800 cleaning or housekeeping positions, 800 photocopying machine operation jobs, 1,800 office helper jobs and 860 parking lot attendant jobs.  AR 28.  Accordingly, the administrative law judge determined that plaintiff was not disabled.  AR 29.

OPINION

A.  <u>Standard of Review</u>

The standard by which a federal court reviews a final decision by the commissioner is well settled:  the commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence."  42 U.S.C. § 405(g).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

16

Richardson v. Perales, 402 U.S. 389, 401 (1971).  When reviewing the commissioner's findings under § 405(g), the court cannot reconsider facts, reweigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the administrative law judge regarding what the outcome should be.  Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000).  Thus, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the commissioner.  Edwards v. Sullivan, 985 F.2d 334, 336 (7th Cir. 1993).  Nevertheless, the court must conduct a "critical review of the evidence" before affirming the commissioner's decision, id., and the decision cannot stand if it lacks evidentiary support or "is so poorly articulated as to prevent meaningful review."  Steele v. Barnhart, 290 F.3d 936, 940 (7th Cir. 2002).  When the administrative law judge denies benefits, he must build a logical and accurate bridge from the evidence to his conclusion.  Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001).

## B.  Medical Opinions

Plaintiff argues that the administrative law judge failed to properly consider and evaluate the medical opinions of Drs. Goodlund, Radisewitz and Rattan.  Although an administrative law judge must consider all medical opinions of record, he is not bound by those opinions.  Haynes v. Barnhart, 416 F.3d 621, 630 (7th Cir. 2005).  "[T]he weight

17

properly to be given to testimony or other evidence of a treating physician depends on circumstances." Hofslien v. Barnhart, 439 F.3d 375, 377 (7th Cir. 2006). When a treating physician's opinion is well supported and no evidence exists to contradict it, the administrative law judge has no basis on which to refuse to accept the opinion. Id.; 20 C.F.R. § 404.1527(d)(2). When, however, the record contains well supported contradictory evidence, the treating physician's opinion "is just one more piece of evidence for the administrative law judge to weigh," taking into consideration the various factors listed in the regulation. Id. These factors include the number of times the treating physician has examined the claimant, whether the physician is a specialist in the allegedly disabling condition, how consistent the physician's opinion is with the evidence as a whole and other factors. 20 C.F.R. § 404.1527(d)(2). An administrative law judge must provide "good reasons" for the weight he gives a treating source opinion, id., and must base his decision on substantial evidence and not mere speculation. White v. Apfel, 167 F.3d 369, 375 (7th Cir. 1999).

1. Dr. Goodlund

Plaintiff asserts that the administrative law judge erred at step three in refusing to accept Dr. Goodlund's March 2007 opinion that she had a mental impairment that met or equal a listed impairment. She contends that the only contradictory evidence is the opinion

18

of Dr. Rattan, who was a non-examining state agency psychologist.  Plaintiff is correct that
the opinion of a non-examining physician is not sufficient by itself to provide the evidence
necessary to reject a treating physician's opinion.  Gudgel v. Barnhart, 345 F.3d 467, 470
(7th Cir. 2003).  However, in this case, the administrative law judge did not rely solely on
Rattan's conclusions in rejecting Goodlund's opinion.  He correctly noted that Goodlund
reached his conclusion in 2007, after plaintiff had turned 22 years old.  The adjudicator also
found Goodlund's opinion inconsistent with his own earlier statements, the opinions of other
physicians and the fact that plaintiff had been maintaining collegiate status.  These findings
are well-founded.

The administrative law judge pointed out problems with the various medical opinions
of plaintiff's diagnoses and the factors contributing to her problems.  After admitting
plaintiff to the hospital in June 2002, Dr. Goodlund stated that it was difficult to sort out
whether plaintiff's condition was primarily bipolar rapid cycling or affective disorder with
a rather large oppositional defiant component.  A month later, Dr. Trannel similarly
questioned whether plaintiff's behavioral problems and substance abuse were directly related
to her bipolar disorder diagnosis or instead a component of a behavioral disorder and
adolescent development.  Plaintiff asserts correctly that Trannel labeled her as chronically
disabled.  However, the administrative law judge noted that Trannel made no specific

19

findings to that effect.  AR 27.  In fact, Dr. Trannel concluded that if plaintiff were to become independent from her parents, she might seek out treatment for herself.

In January 2003, Dux reported that plaintiff would have a lot to offer if she was forced to be more responsible for herself, attributing at least some of plaintiff's problems to the conflicts with her parents.  In 2004, Dr. Clouse, the psychiatrist to whom Goodlund had referred plaintiff, noted that plaintiff's history of bipolar disorder was not "completely convincing" because of several complicating factors, including her past oppositional behavior, alcohol and marijuana use, emotional immaturity and lack of independence from her parents.

The predictions of plaintiff's providers proved to be correct.  Plaintiff entered college in 2005 and began living independently.  By January 2007, Goodlund reported that she was maintaining a 3.8 grade point average.  In his March 2007 opinion, he stated that plaintiff was doing well and assigned her a Global Assessment Functioning score of 60, one of the highest scores he had ever given her.  From this, I find that the administrative law judge provided good reasons, for not giving controlling weight to Goodlund's opinion.  Hofslien, 439 F. 3d at 377 (administrative law judge determines how much weight to give various medical opinions and court will uphold that decision if it is supported by substantial evidence).

In a related argument, plaintiff faults the administrative law judge for not explaining specifically why he rejected Dr. Goodlund's opinion that she would be absent three days a

month.  However, this restriction was included in the March 2007 report and constituted part of the reason that Goodlund found plaintiff disabled.  Because the administrative law judge found the March 2007 report inconsistent with the other evidence of record, he was not required to consider or adopt any individual findings within the report.  Plaintiff points to no other evidence supporting this limitation.

## 2.  Dr. Radisewitz-Rommes

Plaintiff contends that the administrative law judge should have accounted for the limitations assessed by Dr. Radisewitz-Rommes, who noted that plaintiff's emerging manic episodes could cause significant conflict in the work place and that her mania and lack of motivation would impede her concentration, persistence and pace.  However, like Goodlund, Radisewitz-Rommes concluded that plaintiff was doing quite well on her current medications and had the ability to understand, remember and carry out simple instructions; respond appropriately to supervisors and coworkers; and maintain concentration, attention and pace.

I agree with respondent that the administrative law judge's findings are consistent with Dr. Radisewitz-Rommes's assessment.  Like Radisewitz-Rommes, the adjudicator found that plaintiff had a *limited but satisfactory* ability to relate to coworkers, deal with the public, interact with supervisors and maintain attention and concentration.  The administrative law judge also found that plaintiff was *seriously limited but not precluded* from work requiring her

21

to understand, remember and carry out detailed instructions.  Although Radisewitz-Rommes commented on plaintiff's abilities only with respect to simple instructions, she did not state that plaintiff could not understand, remember and carry out detailed instructions.  Nothing in the record indicates that plaintiff could not understand, remember and carry out *any* detailed instructions.  In fact, both Dr. Goodlund and Dux commented on plaintiff's high intelligence,  which is evidenced by the fact that plaintiff was able to maintain a high grade point average in college.  As previously discussed, almost all of the physicians of record agreed that family conflict played a large role in plaintiff's symptoms.  Once plaintiff started college and gained some independence from her parents, her condition improved.  Plaintiff's Global Assessment of Functioning score increased from a 40 or 50 (serious symptoms) in the early 2000's to a 60 or 70 (mild symptoms) in 2007.

In any event, even if plaintiff's mania and lack of motivation at times interfered with her concentration, persistence and pace and ability to relate to others, most of the jobs identified by the vocational expert (e.g., housekeeper, parking attendant and photocopy machine operator) do not require a high degree of steady concentration, sociability or ability to perform difficult tasks.  Therefore, any error committed by the administrative law judge in failing to account for plaintiff's concentration or sociability problems is harmless.  Donahue v. Barnhart, 279 F.3d 441, 444 (7th Cir. 2002) (remand not required where ALJ failed to include plaintiff's difficulties with concentration and sociability in hypothetical

because those skills not essential in janitorial, assembly and hand-packing jobs identified by vocational expert).  Further, the jobs are unskilled, which the commissioner defines as work that requires little or no judgment and involves only simple tasks that can be learned in a short period of time.  20 C.F.R. § 416.968(a).  Therefore, it is of no consequence that the administrative law judge found plaintiff seriously limited but not precluded from understanding, remembering and carrying out detailed instructions.

3.  <u>Dr. Rattan</u>

Finally, plaintiff argues that the administrative law judge failed to properly consider the opinion of Dr. Rattan, the state psychologist who found plaintiff markedly limited with respect to detailed instructions and moderately limited in all other areas.  However, the administrative law judge specifically stated that although he was not convinced that plaintiff had moderate limitations in concentration, persistence and pace because of her ongoing college studies, he concurred with Rattan's findings and accounted for these limitations in his mental residual functional capacity assessment.  Moreover, as Dr. Radisewitz-Rommes did, Rattan noted in his narrative opinion that plaintiff was capable of routine and unskilled work, which is consistent with the adjudicator's residual functional capacity assessment, as discussed previously.

23

In sum, the administrative law judge properly evaluated all of the medical opinions of record.  He gave good reasons for rejecting Dr. Goodlund's opinions, which were supported by substantial evidence, and he made a residual functional capacity assessment that accounted for the limitations found by Drs. Radisewitz-Rommes and Rattan.

ORDER

IT IS ORDERED that the decision of defendant Michael J. Astrue, Commissioner of Social Security, is AFFIRMED and plaintiff Rachel A. Zimmerman's appeal is DISMISSED. The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 23rd day of October, 2009.

BY THE COURT:

/s/

_____

BARBARA B. CRABB
District Judge

24